UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
KAREEM TILLMAN,

                            Plaintiff,

            -against-

LURAY'S TRAVEL,

                        Defendant.

**MEMORANDUM & ORDER**

**14-CV-105 (NGG) (JO)**

------------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

      Pro se Plaintiff Kareem Tillman brings this employment discrimination action against

Defendant Luray's Travel ("Luray") for violating Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17, and the overtime provisions of the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq. (See Compl. (Dkt. 1).) Tillman alleges that

Luray discriminated against him on the basis of race when his employment was terminated on

two separate occasions, in 2010 and 2013. (Id.) He further alleges that Luray subjected him to a

hostile work environment. (Id.) Finally, Tillman alleges that Luray did not pay him overtime

even though he worked more than forty hours per week. (Id.) On September 17, 2014, Tillman

moved for summary judgment on all of his claims. (Pl.'s Mot. for Summ. J. (Dkt. 31).) On

October 17, 2014, Luray cross-moved for summary judgment on all of Tillman's claims. (Def.'s

Mot. for Summ. J. (Dkt. 28).) For the reasons discussed below, Luray's motion for summary

judgment is GRANTED IN PART and DENIED IN PART, and Tillman's motion for summary

judgment is DENIED in full.

1

I.   **BACKGROUND**

   A.   **Factual Background**

      Except as otherwise noted, the following facts are undisputed.  Where facts are in dispute, the court credits the non-movant's version of the particular fact.[1]  The court has not included in this section facts introduced by the parties that are not material to Plaintiff's claims.

      1.   Luray's Employment of Tillman

      Luray, an affiliate of Citywide Transit, Inc. ("Citywide"),[2] provides school bus transportation services for a number of entities, both public and private, in the New York City area.  (Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl.'s 56.1") (Dkt. 37) ¶ 1; Def.'s Statement of Material Facts in Supp. of its Mot. for Summ. J. ("Def.'s 56.1") (Dkt. 28-5) ¶ 1.)  Tillman was employed by Luray on two separate occasions: once in 2010, and again in 2013.  (Pl.'s 56.1 ¶¶ 3, 27; Def.'s 56.1 ¶¶ 3, 27.)  Each period of employment ended with Luray terminating Tillman's employment.  (Pl.'s 56.1 ¶¶ 18, 40; Def.'s 56.1 ¶¶ 18, 40.)  Tillman has alleged discrimination on the basis of race in connection with each termination.

      2.   Tillman's 2010 Employment

      Luray hired Tillman as a temporary bus driver in May of 2010.  (Pl.'s 56.1 ¶ 3; Def.'s 56.1 ¶ 3.)  At the time of his hiring, he was advised that he would be paid a fixed salary of $600 per week for a four-day, 40-hour per week position—a rate consistent with that paid to

---

[1] Because Plaintiff is proceeding pro se, the court has performed an independent review of the entire record submitted by the parties to determine whether there are disputed issues of material fact.  See Sosa v. N.Y. State Div. of Human Rights, No. 11-CV-5155 (NGG) (VVP), 2015 WL 5191205, at *1 n.2 (E.D.N.Y. Sept. 4, 2015); McClendon v. Cty. of Nassau, No. 11-CV-0190 (SJF) (ETB), 2012 WL 4849144, at *2 (E.D.N.Y. Oct. 11, 2012); Williams v. City of New York, No. 06-CV-6601 (NGG), 2009 WL 3254465, at *1 n.1 (E.D.N.Y. Oct. 9, 2009).  Likewise, the court will consider Tillman's filings to be sworn statements so long as they are otherwise admissible.  See Sosa, 2015 WL 5191205, at *1 n.2; Washington v. William Morris Endeavor Entm't, LLC, No. 10-CV-9647 (PKC), 2014 WL 4401291, at *1 n.1 (S.D.N.Y. Sept. 5, 2014).

[2] The named entity on a number of the exhibits submitted by the parties is Citywide, not Luray.  However, for the sake of clarity, and because that distinction is immaterial to the resolution of the instant motion, the court refers to Citywide as "Luray" for purposes of this motion.

other drivers assigned to private routes, such as the one Tillman drove in 2010. (Def.'s 56.1 ¶ 4; Aff. of Indra Fouche ("Fouche Aff.") (Dkt. 28-2) ¶ 4.) His shifts included a three-hour break each day between transporting passengers, and he was advised that time spent on break would not be compensated. (Fouche Aff. ¶ 4.) Tillman was assigned to work as a "cover driver" on a private route for the summer of 2010, transporting clients of Contemporary Guidance Services ("CGS"). (Pl.'s 56.1 ¶ 6; Def.'s 56.1 ¶ 6.) Tillman understood that as a "cover driver," he was only covering the route until the permanent driver returned from a temporary absence. (Pl.'s 56.1 ¶ 7; Def.'s 56.1 ¶ 7; see also Fouche Aff. ¶¶ 5, 7.)

On or about September 6, 2010, Tillman received a letter of employment signed by Indra Fouche, at that time the General Manager of Luray (Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶ 8; see also Fouche Aff. ¶ 2), reflecting Luray's desire to transition Tillman from a temporary, "cover driver" position into a full-time position with the company (Fouche Aff. ¶ 7). Luray planned to shift Tillman to a different route, transporting students for the New York City Department of Education ("DOE").[3] (Def.'s 56.1 ¶ 9; Fouche Aff. ¶ 7.) In order to drive this route, the DOE required Tillman to obtain certification, a process which, among other things, required him to submit to a statewide criminal background check.[4] (Def.'s 56.1 ¶¶ 10-11; Fouche Aff. ¶ 7; Aff. of Brian Nolan ("Nolan Aff.") (Dkt. 28-4) ¶ 2.)

On or about September 13, 2010, Brian Nolan—lead investigator in the Investigations

---

[3] Tillman disputes that Luray actually planned on moving him to a DOE route, claiming that his purported re-assignment to that route was in fact "pre-textual" and "used as a secondary motive" for his termination. (Pl.'s 56.1 ¶ 9.) Tillman provides no evidence to substantiate this claim, and his own statements fail to create a genuine issue of material fact because Tillman alleges no basis by which a trier of fact could conclude, that he, as a driver, would know about Luray route-planning.

[4] Tillman, in an attempt to call into question the purported necessity of this background check, repeatedly emphasizes that he has a "19-A certification". (Pl.'s 56.1 ¶ 13; Tr. of Dep. of Kareem Tillman (Decl. of Martin M. Adler, Esq. (Dkt. 28-1), Ex. M (Dkt. 28-19)) at 62: 1-11.) However, while this certification may be sufficient to permit Tillman to transport private passengers, such as those associated with CGS, the DOE has more stringent requirements. (Aff. of Brian Nolan (Dkt. 28-4) ¶ 2.) Indeed, Tillman does not allege that a 19-A certification would allow him to drive a DOE route. (Pl.'s 56.1 ¶ 13.)

Unit of the DOE's Office of Pupil Transportation—sent Luray a letter advising it that Tillman's certification application had been denied because of information revealed in his criminal background check.[5]  (Def.'s 56.1 ¶ 12; Fouche Aff. ¶ 8; Nolan Aff. ¶ 3; Sept. 13, 2010, Ltr. (Decl. of Martin M. Adler, Esq. ("Adler Decl.") (Dkt. 28), Ex. D (Dkt. 28-10)).)  Accordingly, Tillman was not allowed to drive the DOE route. (Def.'s 56.1 ¶ 13; Fouche Aff. ¶ 9; Nolan Aff. ¶ 4.)

Fouche contacted Nolan, attempting to determine the reason for the denial of Tillman's certification, but was told that more information could not be made available to her. (Def.'s 56.1 ¶ 14; Fouche Aff. ¶ 10; Nolan Aff. ¶ 5.)  On or about September 29, 2010, Nolan wrote to Fouche, indicating that Tillman could be considered for conditional certification as a school bus driver.[6]  (Pl.'s 56.1 ¶ 16; Def.'s 56.1 ¶ 16; Fouche Aff. ¶ 11; Nolan Aff. ¶ 6; Sept. 29, 2010, e-mail (Adler Decl., Ex. E (Dkt. 28-11)).)  By this time, however, there were no other open routes available.  (Def.'s 56.1 ¶¶ 17, 18; Fouche Aff. ¶¶ 11, 12.)

Tillman was consequently notified that his employment with Luray was terminated. (Def.'s 56.1 ¶ 18; Fouche Aff. ¶¶ 11, 12.)  Tillman did not file any charges against Luray with the Equal Employment Opportunity Commission ("EEOC").  (Pl.'s 56.1 ¶ 26; Def.'s 56.1 ¶ 26.) Tillman contacted Luray on numerous occasions in the years following his termination,

---

[5] Tillman disputes the authenticity of this letter, highlighting the fact that the letterhead was from Matthew Berlin, Executive Director of the New York City Department of Education Office of Pupil Transportation, but the letter was signed by Nolan. (Tr. of Dep. of Kareem Tillman (Adler Decl., Ex. M (Dkt. 28-19)) at 59:9-17; Sept. 13, 2010, Ltr. (Adler Decl., Ex. D (Dkt. 28-10)).)  The record however, indicates that that Nolan had signing authority for Berlin. (Nolan Aff. ¶ 3.)  The record further indicates that the letter in question was, in fact, signed by Nolan on behalf of Berlin.  (Sept. 13, 2010, Ltr. (Adler Decl., Ex. D (Dkt. 28-10)).)  Accordingly, the court finds no genuine issue of material fact regarding the letter's authenticity.

[6] The confusion regarding Tillman's criminal record appears to have been the result of errors in the New York State court system's files.  (See Suppl. Aff. of Indra Fouche (Dkt. 43-2) ¶ 5 n.1.)

expressing an interest in being rehired by the company.[7]  (Def.'s 56.1 ¶ 24; Tr. of Dep. of Kareem Tillman ("Tillman Dep.") (Adler Decl., Ex. M (Dkt. 28-19)) at 84:2-4; Fouche Aff. ¶ 13.)

### 3.    Tillman's 2013 Employment

In January 2013, during a strike by the Local 1181 of the Amalgamated Transit Union (whose members included individuals employed by Luray), Luray rehired Tillman as a replacement bus driver. (Pl.'s 56.1 ¶ 27; Def.'s 56.1 ¶ 27; Fouche Aff. ¶ 15.) Tillman was placed on a private route transporting clients of CGS. (Pl.'s 56.1 ¶ 28; Def.'s 56.1 ¶ 28; Fouche Aff. ¶ 17.) After the strike concluded in February 2013, Luray laid off a number of the temporary drivers, but Tillman retained his job. (Pl.'s 56.1 ¶ 29; Def.'s 56.1 ¶ 29; Fouche Aff. ¶ 16.) In June 2013, Luray engaged in another round of layoffs following its unsuccessful bid on a contract with the DOE (which resulted in the loss of approximately 90% of Luray's business), but Tillman again retained his position. (Pl.'s 56.1 ¶ 30; Def.'s 56.1 ¶ 30; Fouche Aff. ¶ 17.)

The 2011 transportation services agreement (the "2011 Agreement") between Luray and CGS contemplated five separate routes driven by five drivers—three in Brooklyn and two in Manhattan. (Pl.'s 56.1 ¶ 32; Def.'s 56.1 ¶ 32; Fouche Aff. ¶ 19; Aff. of Dawn Mastoridis ("Mastoridis Aff.") (Dkt. 28-3) ¶ 4; 2011 Agreement (Adler. Decl., Ex. F (Dkt. 28-12)).)

---

[7] Tillman alleges that a human resources employee of Luray "promise[d]" him that he would be rehired when work became available. (Pl.'s 56.1 ¶ 25.) The record contradicts this claim. Indeed, Tillman himself testified that Luray merely encouraged him to occasionally check back for open positions for which he could apply:

> Q: So when you would call her, it was sort of a general type we may have openings coming up in the near future, things of that sort?
>
> A. That's right. And they would give me exact months. She would say I have something coming up that month, I have something coming up that month. I'm going to keep you in mind. Call me back.

(Tillman Dep. at 120:9-17.) Accordingly, the court finds no genuine issue of material fact regarding Luray alleged "promise" to Tillman.

Tillman originally drove one of the Brooklyn routes, but in 2013 he was switched to a Manhattan route. (Tillman Dep. at 127:4-6.) On or about September 24, 2013, CGS notified Luray that it would terminate the 2011 Agreement on October 31, 2013. (Pl.'s 56.1 ¶ 33; Def.'s 56.1 ¶ 33; Fouche Aff. ¶ 20; Mastoridis Aff. ¶ 5; Sept. 24, 2013, Ltr. (Adler. Decl., Ex. G (Dkt. 28-13)).) Accordingly, on or about September 27, 2013, Luray sent Tillman a letter explaining that, due to the termination of the 2011 Agreement and a lack of other open routes, his last day of employment with Luray would be October 31, 2013. (Pl.'s 56.1 ¶ 34; Def.'s 56.1 ¶ 34; Fouche Aff. ¶ 21.) The letter made clear that the decision was in no way motivated by Tillman's job performance. (Fouche Aff. ¶ 21; Sept. 27, 2013, Ltr. (Adler Decl., Ex. I (Dkt. 28-15)).) Tillman received this letter. (Pl.'s 56.1 ¶ 34.)

On October 2, 2013, CGS wrote to Fouche, notifying her that after reconsideration, CGS would continue to utilize Luray's services for the two Manhattan routes from the 2011 Agreement. (Def.'s 56.1 ¶ 35; Fouche Aff. ¶ 22; Mastoridis Aff. ¶ 6; Oct. 2, 2013, Ltr. (Adler Decl., Ex. J (Dkt. 28-16)).) CGS requested a new agreement reflecting the changed terms. (Fouche Aff. ¶ 22; Mastoridis Aff. ¶ 6; Oct. 2, 2013, Ltr.) On October 25, 2013, the parties signed a new agreement (the "2013 Agreement"), reflecting the fact that Luray would only drive two Manhattan routes for CGS.[8] (Def.'s 56.1 ¶ 36; Fouche Aff. ¶ 23; Mastoridis Aff. ¶ 7; 2013

---

[8] Tillman disputes that these negotiations actually occurred. (Pl.'s 56.1 ¶ 36.) He alleges that the original contract between Luray and CGS was never truly cancelled, and that Luray fabricated this story to justify the termination of his employment (calling it a "pre-meditated conspiracy"). (Compl. at 6.) Tillman attaches and references a statement from Keisha Cockrell, a CGS employee, which he claims corroborates this account. (Feb. 26, 2014, Ltr. (Revised Request for Summ. J. (Dkt. 35), Ex. D (Dkt. 35-1)) at ECF page 15.) However, Cockrell's statement does not create a genuine issue of material fact. The statement is unsworn and from a source with no apparent personal knowledge of the contract negotiations. In general, unsworn letters carry little to no weight as evidence in opposition to a motion for summary judgment. See Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 361 (S.D.N.Y. 2006) (holding that a signed but unsworn letter, which is not otherwise authenticated, is hearsay and "should not be considered as evidence in opposition to a motion for summary judgment"); see also United States v. Jude Hotel Corp., 77 F.3d 648, 657-58 (2d Cir. 1996) ("The submission of [an] unsworn letter was an inappropriate response to the government's motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court.")

Agreement (Adler Decl., Ex. K (Dkt. 28-17)).)  Luray decided to fill the two remaining positions

with the longest-tenured drivers of the five routes contemplated by the 2011 Agreement: Dillon

Rathan and Ousman Gumanah, each of whom had been employed by Luray for longer than

Tillman.  (Def.'s 56.1 ¶ 37; Fouche Aff. ¶ 24.)  There were no other open routes available for

Tillman, and accordingly, his employment was terminated on October 31, 2013.

(Def.'s 56.1 ¶¶ 38-40; Fouche Aff. ¶¶ 23, 25.)

Shortly thereafter, Tillman filed a charge (the "EEOC Charge") of racial discrimination

against Luray with the EEOC.  (Pl.'s 56.1 ¶ 42; Def.'s 56.1 ¶ 42.)  On November 26, 2013, the

EEOC issued a notice of right to sue, which Tillman attached to his Complaint.  (Pl.'s 56.1 ¶ 42;

Def.'s 56.1 ¶ 42.)

4.    Tillman's Hours

In each of Tillman's tenures at Luray, he was hired to work four day, forty-hour weeks,

for which he was paid a weekly salary of $600.  (Fouche Aff. ¶ 4; Suppl. Fouche Aff. ¶ 14;

Tillman Dep. at 78:22-79:3.)  Tillman's duties consisted of picking up his passengers from their

homes in the morning and delivering them to their destination, then transporting them back in the

afternoon.  (Tillman Dep. at 28:4-7.)  In the mornings, Tillman typically dropped off his

passengers by 11:00 a.m.  (Tillman Dep. at 29:21-30:2.)  He returned to pick them up

at 2:00 p.m.  (Id. at 30:3-5.)  In the interim, Tillman had a mid-day break for which he was not

compensated.  (Fouche Aff. ¶ 4.)  During this time, Tillman would park the bus in various

locations (Tillman Dep. at 37:12-15), where he would read (id. at 30:13-14), or would leave the

---

In any event, Cockrell's statement, even when taken as true, is insufficient to create a genuine issue of material fact
as to the cancellation of the contract between CGS and Luray.  Cockrell merely states that to her knowledge, no
Luray routes were cancelled, but no record evidence indicates that Cockrell was in a position to know whether Luray
was providing drivers for those routes.  Indeed, Cockrell did not even work for Luray.  Furthermore, Tillman
himself claims no personal knowledge and admits that his basis for disputing the contract termination is the Cockrell
letter.  (Pl.'s 56.1 ¶ 37.)

bus temporarily to get lunch (id. at 31:2-4). On various occasions, he returned to Luray's depot during his mid-day break to have his bus serviced. (Id. at 42:18-23.) After the conclusion of his mid-day break, Tillman picked up his passengers and returned them to their homes, and then returned his bus to the depot; although his last drop off occurred around 5:45 p.m., due to traffic he often would not return to the depot until after 7:00 p.m. (Id. at 33:11-34:2.) Tillman maintained this schedule throughout both his 2010 and 2013 employment. (Tillman Dep. at 123:14-20.)

### B. Procedural History

On January 2, 2014, Tillman filed the Complaint, alleging discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, and violations of the FLSA. (Compl.) On September 17, 2014, Tillman moved for summary judgment against Luray on all of the claims asserted in the Complaint. (Pl.'s Mot. for Summ. J.) On October 17, 2014, Luray cross-moved for summary judgment on all of Tillman's claims. (Def.'s Mot. for Summ. J.) Now before the court are the parties' cross-motions for summary judgment.

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the court "is required to construe the evidence in the light most

favorable to the non-moving party and to draw all reasonable inferences in its favor." Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003); see also Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The moving party bears the initial burden to show an absence of a genuine factual dispute. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment will be granted if the opposing party then "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat summary judgment, the opposing party must do more than demonstrate "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and may not rely on "conclusory allegations," Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990).

In employment discrimination cases where the employer's intent is at issue, "[c]ourts should exercise caution in granting summary judgment." Jacob v. NYSARC, Inc., No. 13-CV-1677 (KPF), 2014 WL 6750654, at *6 (S.D.N.Y. Dec. 1, 2014) (citing Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)). However, courts in this circuit have found that even in the "fact-intensive context of discrimination cases," summary judgment may be warranted. Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004). To survive a motion for summary judgment, a plaintiff alleging discrimination must provide "more than conclusory allegations . . . ." Holcomb, 521 F.3d at 137. In other words, a plaintiff must demonstrate via "hard evidence" that his version of the events is not "wholly fanciful." Jacob, 2014 WL 6750654, at *6 (quoting Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005)).

Finally, the Second Circuit has advised that "special solicitude" be afforded to pro se litigants who are confronted with a motion for summary judgment. Graham v. Lewinski, 848

9

F.2d 342, 344 (2d Cir. 1988).  Thus, when considering a motion for summary judgment brought against a pro se party, the court must "liberally construe the [pro se] party's pleadings 'to raise the strongest arguments that they suggest.'"  Jacob, 2014 WL 6750654, at *7 (quoting McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999)).  Nevertheless, pro se litigants must still be held to the normal standard for summary judgment, and "'bald assertion[s], []  unsupported by evidence,'" will not satisfy the summary judgment standard.  Id. at *7 (alteration in original) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)).

**B.      Title VII Claims**

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1); see also id. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.").

1.      Title VII Administrative Exhaustion Requirement

Title VII requires an aggrieved party "to exhaust administrative remedies before filing suit in federal court."  Fowlkes v. Ironworkers Local 40, 790 F.3d 378, 384 (2d Cir. 2015).  The purpose of this requirement is "'to give the administrative agency the opportunity to investigate, mediate, and take remedial action.'"  Id. (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998)).  This administrative exhaustion requirement "applies to pro se and counseled plaintiffs alike."  Id.  Thus, an injured party must file a charge with either the EEOC or the relevant state agency (in New York, the New York State Division of Human Rights ("NYSDHR")), within 300 days of the alleged discriminatory act as a prerequisite to bringing

that claim in federal court. Ogalo v. N.Y. State Thruway Auth., 972 F. Supp. 2d 301, 305

(N.D.N.Y. 2013) (citing 42 U.S.C. § 2000e-5; 42 U.S.C. § 12117(a)). Failure to timely file such

a charge ordinarily results in dismissal of the claim in federal court. Id.

Thus, administrative exhaustion is "'a precondition to bringing [Title VII] claims in

federal court.'" Fowlkes, 790 F.3d at 384 (quoting Legnani v. Alitalia Linee Aeree Italiane,

S.P.A., 274 F.3d 683, 686 (2d Cir. 2001)). However, the requirement is not jurisdictional, but is

instead an equitable precondition to suit, subject to equitable defenses. Zipes v. Trans World

Airlines, Inc., 455 U.S. 385, 393 (1982) ("[F]iling a timely charge of discrimination with the

EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that . . . is

subject to waiver, estoppel, and equitable tolling.").

A number of equitable defenses can be raised by a plaintiff who made no administrative

charge whatsoever.[9] The futility exception applies where filing a charge would be futile because

the administrative agency had previously "taken a firm stand" against the grievant's position.

See Fowlkes, 790 F.3d at 386 (quoting Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997)).

The continuing violation doctrine delays the tolling of the statutory exhaustion period until the

last occurrence of a pattern of discriminatory practices. See Rodriguez v. County of Nassau, 547

F. App'x 79, 80 (2d Cir. 2013) (summary order) (citing Fitzgerald v. Henderson, 251

F.2d 345, 359 (2d Cir. 2001)). Finally, equitable estoppel applies where the allegedly

discriminating party attempts to prevent the injured party from filing an administrative

---

[9] The majority of equitable defenses apply in instances where the aggrieved party did in fact file a charge with the appropriate agency, but failed directly to address the subsequently raised federal claim in the charge. Claims not raised in an administrative complaint may be asserted in federal court where the claims: (1) concern conduct that falls within the scope of an EEOC investigation that can reasonably be expected to grow out of the charge; (2) allege retaliation for filing the charge; or (3) concern further incidents of discrimination carried out in precisely the same manner alleged in the charge. Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003) (internal quotation marks and citation omitted). Because Tillman did not to file an administrative charge following his 2010 termination, these defenses do not apply.

complaint, such as by concealing the facts underlying a cause of action, or by falsely promising the party's imminent reinstatement. See Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 48-50 (2d Cir. 1985).

### 2.   Discrimination Standard

"Employment discrimination cases . . . are frequently said to fall within one of two categories: 'pretext' cases and 'mixed-motives' cases." Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180 (2d Cir. 1992) (internal citations omitted). Here, both Tillman's Complaint and the briefs he submitted appear exclusively to argue pretext. (See Compl. at 6; Pl.'s Mem. of Law in Response to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. 36) at 4.) Thus, the court interprets Tillman as raising a theory of pretextual discrimination.[10]

In pretext cases, courts employ the familiar burden-shifting analysis first articulated in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). Under this framework, a plaintiff must first demonstrate a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. If the plaintiff succeeds in this endeavor, the burden shifts to the defendant to articulate (but not

---

[10] Under the alternative, mixed-motives approach—first outlined by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)—the plaintiff's opening burden is greater than in establishing a prima facie case under a pretext analysis; the plaintiff must initially "focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." Tyler, 958 F.2d at 1181 (quoting Price Waterhouse, 490 U.S. at 258 (plurality op.)). If the plaintiff makes such a showing, the burden is on the defendant to prove its affirmative defense "'that it would have reached the same decision as to [the employee's employment] even in the absence of the'" impermissible, discriminatory factor. Id. (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). In other words, in a mixed-motives case, "the plaintiff can satisfy his entire burden of proof by initially producing evidence sufficient to demonstrate that discrimination was 'in fact a "motivating" or "substantial" factor in the employment decision.'" Vahos v. Gen. Motors Corp., No. 06–CV–6783 (NGG) (SMG), 2008 WL 2439643, at *4 n.5 (E.D.N.Y. June 16, 2008) (quoting De la Cruz v. N.Y. City Human Res. Admin. Dept. of Soc. Servs., 82 F.3d 16, 23 (2d Cir.1996)). Here, Plaintiff does not appear to put forward a mixed-motives theory. The Second Circuit has stated that "to warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." Raskin v. Wyatt Co., 125 F.3d 55, 60-61 (listing as examples of such satisfactory evidence "policy documents and evidence of statements or actions by decisionmakers that may be viewed as directly reflecting the allegedly discriminatory attitude"). Tillman has presented no direct evidence of discrimination. Accordingly, even under a mixed-motive analysis, the court would grant Luray's motion and deny Tillman's.

prove), via admissible evidence, a legitimate reason for the employment decision. See, e.g., Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001). Finally, if the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that the articulated justification was in fact a mere pretext for discrimination. Id. at 469.

A plaintiff's burden at the prima facie stage is minimal. Id. at 467. Nevertheless, a plaintiff must offer more than "unsupported assertions," Jacob, 2014 WL 6750654, at *7 (quoting Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)); he "must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive." Id. (quoting Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001)). To make out the prima facie case of discriminatory termination under Title VII, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified to perform the job in question; (3) he suffered an adverse employment action; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination based on membership in that protected class. Holcomb, 521 F.3d at 138; Ogalo, 972 F. Supp. 2d at 306-07.

If a plaintiff successfully presents a prima facie case of discrimination under Title VII, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." Stratton v. Dep't for the Aging for N.Y.C., 132 F.3d 869, 879 (2d Cir. 1997). "The defendant's burden at this step in the analysis is also 'light.'" Jacob, 2014 WL 6750654, at *8 (quoting Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998)). "The employer need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." Id. (quoting Greenway, 143 F.3d

13

at 52)).

Finally, if the defendant provides a legitimate, non-discriminatory rationale for the employment decision, the rebuttable presumption is overcome, with the burden returning to the plaintiff to ultimately prove discrimination by a preponderance of the evidence. Fields v. N.Y. Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 121 (2d Cir. 1997). "The Second Circuit has explained that 'there are two distinct ways for a plaintiff to prevail—either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions.'" Jacob, 2014 WL 6750654, at *8 (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)). "In short, the plaintiff must prove that 'discrimination was the real reason for the [adverse] employment action.'" Oteng-Amoako, No. 13-CV-5760 (PAC) (FM), 2014 WL 7476239, at *4 (S.D.N.Y. Dec. 30, 2014 (quoting Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)).

        3.    Hostile Work Environment

"A hostile work environment claim arises 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Lucenti v. Potter, 432 F. Supp. 2d 347, 361 (S.D.N.Y. 2006) (Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive"—does not rise to the level of a hostile work environment. Harris v. Forklift Sys., Inc., 510 U.S. at 21. The Supreme Court has noted that whether an environment is hostile or abusive can be determined only by looking at all the circumstances; nonetheless, the Court has

14

provided a number of factors that may guide the inquiry, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.

Accordingly, "hostile work environment claims present mixed questions of law and fact that are especially well-suited for jury determination." Messer v. Fahnestock & Co., Inc., No. 03-CV-4989 (ENV) (JMA), 2008 WL 4934608, at *8 (E.D.N.Y. Nov. 18, 2008) (internal quotation marks and citations omitted). Nevertheless, it is the law of this circuit that "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 (2d Cir. 2006) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997)). Thus, in order to survive a motion for summary judgment, "a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Solomon v. Southampton Union Free Sch. Dist., 504 F. App'x 60, 61 (2d Cir. 2012) (summary order) (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000)). Title VII "does not set forth a general civility code for the American workplace." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 63, 68 (2006) (internal quotation marks and citation omitted). Further, "[a] 'hostile work environment is not synonymous with an unpleasant, harsh, combative or difficult work environment." Benette v. Cinemark U.S.A., Inc., 295 F. Supp. 2d 243, 250 (W.D.N.Y. 2003).

It is "axiomatic" that in order to establish a claim of a hostile work environment, a plaintiff must link the hostile conduct to his or her protected class. Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). A plaintiff may accomplish this by proffering direct evidence that

his protected status was the cause of the abusive conduct.  However, a plaintiff may also bring forward "facially neutral incidents" as evidence "so long as a reasonable fact-finder could conclude that they were, in fact, based on [the protected status]." Id. at 378.  The fact-finder's ultimate determination must be based only on abusive conduct proven to be based on the plaintiff's membership in the protected class. Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117 (2d Cir. 2010).

### C.   Overtime Pay Claims

"The FLSA sets minimum requirements for wage and overtime payments and prohibits employment for more than a specified number of hours per week without proper overtime compensation." Callari v. Blackman Plumbing Supply, Inc., 988 F. Supp. 2d 261, 275 (E.D.N.Y. 2014).  "In particular, an employee who works in excess of forty hours a week must be compensated for each hour worked in excess of forty hours 'at a rate not less than one and one-half times the regular rate at which he is employed.'" Id. (quoting 29 U.S.C. § 207(a)(1)). Employers who violate the statute "'shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation,' as well as for liquidated damages." Arasimowicz v. All Panel Sys., LLC, 948 F. Supp. 2d 211, 216 (D. Conn. 2013) (quoting 29 U.S.C. § 216(b)).

Coverage limitations restrict the FLSA's applicability.  "Engagement in interstate commerce, either by an employee or by the employer as a whole, is a prerequisite for liability for under FLSA's overtime requirement.  A plaintiff may satisfy this requirement by showing 'individual coverage' through his personal engagement in interstate commerce or 'enterprise coverage' through the employer's engagement in interstate commerce." Ethelberth v. Choice Sec. Co., No. 12-CV-4856 (PKC), 2015 WL 861756, at *9 (E.D.N.Y. Feb. 27, 2015) (citing

Rodriguez v. Almighty Cleaning, Inc., 784 F. Supp. 2d 114, 120 (E.D.N.Y. 2011)). The employee bringing the claim for overtime pay bears the burden of establishing the FLSA's coverage of his employer. Id.; see also Jian Long Li v. Li Qin Zhao, 35 F. Supp. 3d 300, 305 (E.D.N.Y. 2014) ("[T]he failure of the plaintiff to demonstrate an issue for trial involving employee coverage, based on either the enterprise or individual theory, is a proper basis for dismissing his FLSA claim on summary judgment.")

"A plaintiff bringing a claim for overtime compensation under the FLSA must do so 'within two years after the cause of action has accrued, unless a plaintiff can show that a defendant's violation of the [FLSA] was willful, in which case a three-year statute of limitations applies.'" Callari, 988 F. Supp. 2d at 277 (alteration in orginal) (quoting Solis v. SCA Rest. Corp., 938 F. Supp. 2d 380, 393 (E.D.N.Y. 2013)). A cause of action under the FLSA accrues "with each payday following an allegedly unlawful pay period." Id. (quoting Lee v. ABC Carpet & Home, 256 F.R.D. 193, 199 (S.D.N.Y. 2006)); see also 29 C.F.R. § 790.21(b) ("[A] cause of action under the [FLSA] for . . . unpaid overtime compensation . . . 'accrues' when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends."). Thus, a plaintiff has either two or three years from the final accrual of a cause of action to file a complaint. 29 U.S.C. §216(c); see also Tacuri v. Nithun Constr. Co., No. 14-CV-2908 (CBA) (RER), 2015 WL 790060, at *6 (E.D.N.Y. Feb. 23, 2015).

## III.   DISCUSSION

Tillman alleges employment discrimination on the basis of race in connection with both his 2010 and 2013, and a claim of a hostile work environment. In addition, Tillman brings an FLSA claim for overtime pay. For the reasons set forth below, the court grants summary judgment to Luray on all of Tillman's Title VII claims, denies Luray's motion for summary

17

judgment on Tillman's FLSA claim, and denies Tillman's motion in full.

### A.   Discrimination Claims

1.   Tillman's 2010 Claim is Unexhausted

Luray argues that Tillman's claim of race discrimination arising out of his 2010 termination from employment should be dismissed because Tillman failed to exhaust administrative remedies. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (Dkt. 28-6) at 3-4). The court agrees.

Tillman's 2010 termination occurred sometime in September of 2010. (Pl.'s 56.1 ¶ 18.) Even assuming that his last day was September 30, 2010, the last day to timely file an administrative charge with either the EEOC or the NYSDHR was in July of 2011. Tillman admits that he never filed an administrative charge in connection with his 2010 tenure of employment. (Pl.'s 56.1 ¶ 26; Def.'s 56.1 ¶ 26; Tillman Dep. at 97:5-98:3.) Thus, Tillman failed to exhaust the administrative remedies available to him in connection with his 2010 claim.

Further, Tillman's claim of discrimination does not fall within one of the exceptions to the administrative exhaustion requirement. First, because discrimination based on race is not a position against which the EEOC and NYSDHR have taken a "firm stand," Tillman cannot avail himself to the futility exception. See EEOC, Compliance Manual § 15 (2006) (describing grounds for a race discrimination claim); cf. Fowlkes, 790 F.3d at 386 (stating that plaintiff, who failed to file an administrative charge in connection with the alleged discrimination he suffered based on his transgender status, might have a colorable futility defense because the EEOC had, at the time, a consistent stance that such claims of discrimination would not be recognized under Title VII). Tillman cannot rely on the continuing violation doctrine because his termination was a discreet event. Discrete acts, such as termination, "start[] a new clock for filing charges

18

alleging [discrimination in connection with] that act." <u>Ogalo</u>, 972 F. Supp. 2d at 305-306

(quoting <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002)).  Last, Tillman

cannot rely on the equitable estoppel doctrine; he has proffered no evidence indicating that Luray

attempted to hinder his filing of an administrative complaint.  The closest Tillman comes is his

bare assertion that a human resources employee at Luray "promise[d]" him that he would be

given a position back when one became available.  However, Tillman's own testimony belies

this assertion.  <u>See supra</u> n.7.

      Tillman failed to exhaust his administrative remedies by timely filing a complaint with

the EEOC or the NYSDHR in connection with his 2010 termination.  Because his claims do not

fall within the recognized exceptions to the administrative exhaustion requirement, he cannot

bring them in federal court.  Therefore, Luray's motion for summary judgment in connection

with the claims arising out of Tillman's 2010 termination is granted on this basis, and Tillman's

motion is denied.[11]

    2.   <u>Tillman 2013 Claim Fails the McDonnell Douglas Test</u>

      Proceeding to Tillman's Title VII claim related to his 2013 employment, the court grants

Luray's motion for summary judgment, and denies Tillman's motion.  Tillman has failed to

satisfy the burden-shifting analysis set out in <u>McDonnell Douglas</u> because he cannot raise a

triable issue of fact that Luray's proffered justification for terminating his employment was a

---

[11] Even if Tillman had filed a timely charge with the EEOC in connection with his 2010 termination, that claim would fail the <u>McDonnell Douglas</u> test for discrimination, and therefore would not survive a motion for summary judgment.  Even assuming that Tillman could establish a prima facie case of discrimination, Luray conclusively demonstrated a legitimate business reason for Tillman's 2010 termination.  The DOE denied Tillman's certification, and Luray subsequently filled all of their open positions before the DOE amended its position and stated that Tillman could be certified.  (Def.'s Mem. at 11.)  Tillman adduced no evidence tending to prove that this reason was a pretext; he merely labels Luray's articulated reason as "pretextual" and cites to his 19-A certification in an attempt to characterize the DOE certification as a clearly unnecessary step, illustrating Luray's "pre-meditated conspiracy" to terminate his employment.  (<u>See</u> Pl.'s 56.1 ¶ 18; Compl. at 6.)  However, Tillman's 19-A certification was irrelevant to his certification as a driver on DOE routes.  <u>See supra</u> n.4.  Accordingly, as he provides no support for his argument that Luray's articulated reason was a pretext, his Title VII claim in connection with his 2010 termination would fail even if he had timely filed a charge of discrimination.

pretext masking a racially discriminatory motive.

The first step in a <u>McDonnell Douglas</u> assessment requires a plaintiff to establish a prima facie case of discrimination. <u>Jacob</u>, 2014 WL 6750654, at *7. In instances where the plaintiff alleges a racially discriminatory termination, he must show his membership in a protected class, that he was qualified for the job in question, and that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination. <u>Ogalo</u>, 972 F. Supp. 2d at 306-07 (internal citations omitted).

Here, it is undisputed that Tillman satisfies the first three elements of the prima facie case; he is an African-American, and therefore a member of a protected class; his qualifications for the position in question are not in dispute; and it is well-settled that a termination is an adverse employment action.

There are a number of ways a plaintiff can establish an inference of discrimination. A plaintiff may show "that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." <u>Wali v. One Source Co.</u>, 678 F. Supp. 2d 170, 180-81 (S.D.N.Y. 2009) (quoting <u>Graham v. Long Island R.R.</u>, 230 F.3d 34 at 38-39 (2d Cir. 2000)). For a "disparate treatment" analysis to apply, a plaintiff must be similarly situated "in all material respects" to the individuals with whom he seeks to identify himself. <u>Id.</u> at 180-81.

Additionally, a plaintiff can establish an inference of discrimination by showing that when terminating the employment, the employer acted with "discriminatory animus." <u>Wali</u>, 678 F. Supp. 2d at 181 (citing <u>Galimore v. City Univ. of N.Y.</u>, 641 F. Supp. 2d 283-84 (S.D.N.Y. 2009)). A plaintiff may demonstrate such animus by proffering evidence of discriminatory verbal comments, but such statements will only establish the inference of

discrimination "'when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff.'" Id. (quoting Galimore, 641 F. Supp. 2d at 283-84)). Moreover, the allegedly discriminatory comments must be made by the individual decision maker responsible for the adverse employment action suffered by the plaintiff. Daniel v. AutoZone, Inc., No. 13-CV-118 (GLS) (RFT), 2015 WL 2114158, at *4 (N.D.N.Y. May 6, 2015).

Finally, in a reduction in force case, a plaintiff can establish an inference of discrimination by showing that the employer exercised discretion over which employees to let go, and that the employer chose to retain individuals outside of the protected class. See Burger v. N.Y. Inst. of Tech., 94 F.3d 830, 834 (2d Cir. 1996) (finding a prima facie case where the plaintiff adduced evidence that (1) her job duties were not eliminated, and (2) the employer "believed that the lay-off decision involved a choice" among similar employees); Montana v. First Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 105 (2d Cir. 1989) (holding that a prima facie cases was established where the plaintiff offered evidence showing that (1) the majority of her responsibilities were not eliminated but transferred to an employee outside of the protected class, and (2) the employee was not offered to remain in her position).

Here, Tillman establishes—albeit barely—a prima facie case pursuant to the final method discussed above.[12] Following the contract renegotiation between Luray and CGS, only two of

---

[12] Tillman fails to raise an inference of discrimination via the first two methods. In his briefs, Tillman attempts to employ the "similarly situated" approach, principally alleging that Luray treated him less favorably than Dillon Rathan and Ousman Gumanah, the two individuals who remained employees following the contract renegotiation. (Def.'s 56.1 ¶ 37; Fouche Aff. ¶ 24.) Both Rathan and Gumanah's treatment could conceivably establish an inference of discrimination. However, neither of these individuals are similarly situated to Tillman, as both had been employed by Luray longer than Tillman. (Def.'s 56.1 ¶ 37; Fouche Aff. ¶ 24.) Individuals who have been employed by a company for materially different lengths of time are not "similarly situated" for purposes of establishing a prima facie case under Title VII. Fox v. State Univ. of N.Y., 686 F. Supp. 2d 225, 232 (E.D.N.Y. 2010) (finding that plaintiff was not "similarly situated" to two individuals who had worked for employer eight and thirteen years longer, respectively, than plaintiff). Accordingly, the fact that Rathan and Gumanah were retained by Luray does not raise an inference of discrimination.

the five routes covered by the 2011 Agreement were serviced by Luray. Luray decided to distribute the remaining routes to the two most senior employees, at least one of whom was not African-American. (Def.'s 56.1 ¶ 37; Fouche Aff. ¶ 24). Luray's decision required that Tillman's duties (driving a Manhattan route) were redistributed to a retained employee. Thus, because at least one of the remaining positions following the contract renegotiation was filled by an individual outside of Tillman's protected class, Tillman's job duties were redistributed to the retained employee, and Luray exercised discretion in its decision of who to lay off, Tillman has raised a prima facie case for racial discrimination under Title VII.

Tillman's establishment of the prima facie case shifts the burden to Luray to articulate a legitimate, non-discriminatory reason for his discharge. Oteng-Amoako, 2014 WL 7476239, at *4. Luray has met this burden.

The court finds that Luray has set forth a legitimate, non-discriminatory reason for Tillman's 2013 termination. Specifically, Luray argues that the contract renegotiation with CGS resulted in three of five routes being eliminated (Def.'s 56.1 ¶ 36), and that it chose to fill the remaining positions with the two-longest tenured drivers of the five original routes (id. at ¶ 37). Because Luray had already been forced to downsize due to its loss of the DOE contract, there

---

Next, Tillman attempts to establish an inference by attempting to show that his termination was caused by a racial animus. Tillman claims that his termination was "racially motivated" and cites a number of times where he felt he was treated or spoken to rudely. (Tillman Dep. at 39:24-25.) He makes frequent reference to "hostile" and "nasty" comments that he allegedly received from Luray's shop employees and receptionists (see id. at 44:13-18, 48:20-23), and also states that he was "very uncomfortable with cultural imbalance and the way that [he] was being treated by other workers and staff that were not African American" (Pl.'s 56.1 ¶ 31). However, during his deposition, Tillman admitted that in neither of his tenures of employment with Luray were racially discriminatory comments made to him (see Tillman Dep. at 44:19-23, 158:23-159:3), and moreover, Tillman does not attribute any disparaging comments to Fouche—the decision maker. Therefore, these alleged comments do not raise an inference of discrimination.

Finally, Tillman's bare assertions regarding the percentage of African-Americans employed by Luray (see Pl.'s 56.1 ¶ 2), and his speculative arguments about Luray's alleged distaste for members of his race (see Tillman Dep. at 178:5-179:3) are insufficient on their face to raise an inference of discrimination by Luray based on discriminatory animus. See Wali, 678 F. Supp. 2d at 181 (finding unsupported assertions regarding racial composition of workforce insufficient to establish the inference).

were no remaining openings within the company, and three drivers, including Tillman, had to be let go. (Id. at ¶¶ 39-40.) This assertion is sufficient to satisfy Luray's burden at this stage of the analysis. See Allen v. Chanel, Inc., No. 12-CV-6758 (LAP), 2015 WL 3938096, at *5 (S.D.N.Y. Jun. 26, 2015) ("[E]liminating a position for economic reasons is not discriminatory.").

Thus, the burden returns to Tillman to prove that Luray's proffered reason is a pretext for racial discrimination. Jacob, 2014 WL 6750654, at *8. Tillman "can demonstrate pretext either with direct evidence of discrimination . . . or with indirect or circumstantial evidence." Wali, 678 F. Supp. 2d at 182 (quoting Higgs v. Columbia Univ., No. 05-CV-2642 (DF), 2009 WL 77880, at *15 (S.D.N.Y. Jan. 5, 2009)).

Tillman has made no showing that Luray's proffered reason for his termination was pretextual. While Tillman claims that Luray's justification was made "to cloak the true nature of [its] business which was obviously based on discriminatory practice . . ." (Pl.'s Mem. at 5), and that the termination of employment letter given to him in September of 2013 was part of "premeditated conspiracy" to terminate his employment based on Luray's racial animus (Compl. at 6), he proffers no evidence beyond his own speculation and conjecture to support these assertions. This is insufficient. See Sales v. N.Y.C. Transit Auth., No. 08-CV-3420, 2011 WL 4000988, at *6 (S.D.N.Y., Aug. 6, 2011) (granting motion for summary judgment against employee who attempted to portray employer's articulated legitimate business reason as a pretext using "conclusory statements of no probative value" (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 65 (2d Cir. 1997))). Ultimately, Tillman's argument fails to show that discrimination was "the real reason" for his termination. Wali, 678 F. Supp. 2d at 182 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

The court's conclusion regarding Luray's true intention is bolstered by the same actor

defense, which can weaken an inference of discrimination when the party accused of a discriminatory termination is the same person who initially made the decision to hire the aggrieved individual. [13]  See Inguanzo v. Hous. & Servs., Inc., No. 12-CV-8212 (ER), 2014 WL 4678254, at *17-18 (S.D.N.Y. Sept. 19, 2014) (noting that "[w]hen the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire" (internal quotations omitted)).  Tillman's 2013 period of employment ended nine months after he was hired by Fouche—when Fouche terminated his employment.  (Def.'s 56.1 ¶¶ 38-40; Fouche Aff. ¶¶ 23, 25.)  Consequently, the same actor defense applies, supporting Luray's contention that firing Tillman was not racially motivated.  Accordingly, because Tillman has proffered no evidence of pretext, and in light of the same actor defense, the court grants Luray summary judgment on Tillman's discrimination claim.

### B.    Hostile Work Environment Claim

Interpreting the record in the light most favorable to Tillman, the following events could arguably form the basis for a hostile work environment claim: (1) Luray's shop manager, shop employees, and receptionists were rude to him at times (Tillman Dep. at 39:24-40:4); (2) the shop manager addressed Tillman with a "belligerent and hostile, vulgar" tone, and gave Tillman looks indicating his dislike (id. at 44:13-18); (3) Tillman was provided with "bad busses" that frequently experienced mechanical failures (id. at 45:21-25); (4) a Luray employee told Tillman that he might have to be terminated if Luray lost a court case against a former employee and had to give the former employee his job back (id. at 141:20-144:19).

Based on this evidence, a reasonable jury could not find in Tillman's favor for two

---

[13] The presumption weakens with time (allowing for the possible development of a racial animus in the period between an individual's decision to hire, and later fire, an employee).  Inguazano, 2014 WL 4678254, at * 18.

24

reasons: first, he has not linked any hostility to his race, and second, any remaining allegations are simply not severe or pervasive enough to support a finding that Luray featured an objectively hostile or abusive work environment. As a preliminary matter, Tillman has proffered no direct evidence of Luray discriminating against him on the basis of race. Nor has Tillman provided any evidence that the facially neutral incidents he cites were in fact related to his race. Indeed, Tillman admits that he never overheard any racially disparaging comments being made at Luray. (Id. at 158:23-159:3.) Instead, he attempts to tie the hostility he perceived on the part of Luray's employees to an unspoken racial animus permeating the entire company. However, even if Tillman had adduced some evidence that his treatment was based on his race, his allegations are simply not objectively substantial enough to classify Luray as a hostile work environment. It bears repeating that Title VII "does not set forth a general civility code for the American workplace." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68 (internal quotation marks and citation omitted). Although Tillman has adduced evidence demonstrating unpleasant work conditions at Luray, he falls short of showing that such conditions, and his resultant treatment, were objectively substantial enough to constitute a hostile work environment. See, e.g. Harris, 510 U.S. at 21 (holding that the "mere utterance of an . . . epithet which engenders offensive feelings in an employee" is insufficient to implicate Title VII); McGullam v. Cedar Graphics, Inc., 609 F.3d 70 (2d Cir. 2010) (holding that plaintiff's "subjective perception notwithstanding," alleged prohibited statements "objectively [fell] short of the requisite levels of severity or pervasiveness" required by Title VII). Accordingly, the court grants Luray's motion for summary judgment on the hostile work environment claim, and denies Tillman's cross-motion.

25

C.   **Overtime Pay Claims**

    1.   <u>Tillman's 2010 Claim</u>

Tillman's 2010 termination occurred in September of 2010.  Tillman had either two or three years from that date to file a claim for overtime compensation, depending on whether or not Luray's alleged failure to pay overtime was willful.  <u>Callari</u>, 988 F. Supp. 2d at 277.  Tillman filed his Complaint on January 2, 2014.  As such, even when applying the longer, three-year statute of limitations, Tillman's claim arising out of his 2010 employment are time-barred, and accordingly, the court grants Luray's motion for summary judgment on Tillman's 2010 FLSA claim, and denies Tillman's cross-motion for summary judgment.

    2.   <u>Tillman's 2013 Claim</u>

With regard to the 2013 FLSA claim, the court finds that a genuine issue of material fact precludes granting either party's motion for summary judgment.  Luray claims that upon his hiring, Tillman was informed that his employment was for "a set salary of $600 per week for a four day, 40 hour work week," that his "mid-day break time" would not be compensated, and that the position did not include overtime pay.  (Fouche Aff. ¶ 4; Suppl. Fouche Aff. ¶ 14.)  Tillman, conversely, claims that he never received information regarding Luray's overtime policies.  (<u>See</u> Pl.'s 56.1 ¶¶ 4-5; Tillman Dep. at 79:5-11.)  Moreover, Tillman submitted timesheets covering a 62-day period between July 29, 2013, and October 16, 2013, which demonstrate that on at least one occasion, Tillman worked five days in a week.  (<u>See</u> Timesheets (Pl.'s 56.1, Ex. A (Dkt. 36-1)) at ECF pages 36-40; <u>see also</u> Pl.'s 56.1 ¶ 4 (claiming that he regularly worked five-day weeks).)  Furthermore, Tillman testified that he had to work during his mid-day break:

        Q:  And you would have to do a pretrip inspection each morning?

26

> A:   Yes.   And all of my inspection worked, everything was fine. Everything that needed to work worked, but you can't tell me how bad the shocks are.  You can't tell—there were mornings I had to put air in my own tire as a result of my preinspection seeing that I had a low tire pressure.  There's a lot of different problems with these buses.
>
> Q:  And typically, when you would go to service it, you would have to go during that 11:00 a.m. to 2:00 p.m. break?
>
> A:  Yes, exactly, and it would take the whole duration of it because they have other buses in the front of me."

(Tillman Dep. at 42:7-23.)

Importantly, the FLSA does not count as "hours worked" those hours in which "an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes."  See 29 C.F.R. § 785.16.  "Whether the time is long enough to enable him to use the time effectively for his own purposes depends upon all the facts and circumstances of the case."  Id.  Whether Tillman in fact worked over forty hours a week during his 2013 employment is a fact material to the resolution of his FLSA claim.  Because Tillman has adduced evidence which, taken as true, establish that he did exceed forty hours of work in at least one week, and because Luray disputes this assertion, a genuine issue of material fact arises that precludes a granting of either party's motion for summary judgment.  See Arasimowicz, 948 F. Supp. 2d at 224 (explaining that whether the plaintiff in fact worked any uncompensated overtime was a genuine issue essential to the summary judgment disposition).  The court therefore denies the parties' cross-motions for summary judgment on the 2013 FLSA claim.

27

**IV.   CONCLUSION**

For the reasons set forth above, Luray's motion for summary judgment is GRANTED IN

PART and DENIED IN PART, and Tillman's motion for summary judgment is DENIED IN

FULL.

- All of Tillman's Title VII claims are DISMISSED WITH PREJUDICE.
- Tillman's 2010 FLSA claim is DISMISSED WITH PREJUDICE.
- Finally, the parties are directed to contact Magistrate Judge Orenstein's chambers to schedule the filing of a Joint Pretrial Order in accordance with this court's Individual Rules.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York                           NICHOLAS G. GARAUFIS
       September 30, 2015                              United States District Judge